STOCKE, Appellant, vs. DEPARTMENT OF TAXATION, Respondent.

*September 12—November 26, 1946.*

For the appellant there was a brief by *David Shearer* and *Shearer, Byard, Trogner & Peters,* all of Minneapolis, Minnesota, attorneys, and *Alfred L. Gausewitz* of Madison of counsel, and oral argument by *David Shearer.*

For the respondent there was a brief by the *Attorney General* and *Harold H. Persons,* assistant attorney general, and oral argument by *Mr. Persons.*

BARLOW, J.    The material facts on this appeal are as follows: Since 1927 the appellant, Oswald A. Stocke, has been a resident of Minneapolis, Minnesota, and employed as estimator and general office manager by Maurice Schumacher, a general contractor of that city.    Appellant's monthly salary was $400 until it was reduced to $350 in 1933, and in lieu of the difference between these amounts Schumacher agreed to pay appellant as additional salary ten per cent of the profits made by Schumacher upon his construction work outside of Minneapolis, and in 1934 he increased that percentage to fifteen per cent.    That arrangement was confirmed and continued by a letter written and signed by Schumacher on January 2, 1942, and accepted in writing by Stocke, in which Schumacher stated:

"This is to confirm our verbal understanding as to the terms of your employment commencing at the date of this letter and until further notice:

"While you are engaged in Minneapolis in my office, in connection with my general contracting business, upon work in Minneapolis or its immediate vicinity, you are to receive monthly a salary of $350.

"In connection with work which I hereafter secure, or in which I may hereafter have an interest as joint venturer, or otherwise with others outside of the immediate vicinity of Minneapolis, in lieu of the stated monthly salary above, you are to receive fifteen per cent of my net earnings, as hereinafter defined, upon each of such projects, payable when completed and paid for and received by me.

"In determining 'net earnings' as used in this agreement, there shall be deducted from the profit, if any, which I receive on such projects all of the administrative expense of my Minneapolis office, less the sum of $2,500 per year, which administrative expense shall be figured upon a monthly basis and charged to each of said projects between the period of its commencement and completion and final payment.

"In consideration of the foregoing you agree similarly to assume fifteen per cent of my net loss, if any, on each of such projects, administrative expense as defined above to be used in the same manner in determining net loss.

"It is understood that this arrangement is conditional upon the continuation of your services to me as an employee."

There was no change in this arrangement, which remained in effect until August, 1944, and during all of this period the assets of the business, office furniture and fixtures, and construction equipment were wholly owned by Schumacher without any contribution to capital by appellant. Schumacher signed and alone was liable on the leases for office and for storage space for his equipment used in the business. He alone hired and discharged employees, and the expenses of the business were solely his obligation. He maintained a bank account designated as "Maurice Schumacher," in which all receipts from his construction business were deposited and from which all disbursements of the business were paid. A second account, designated "M. Schumacher," was used solely for paying his living and personal expenses. A third was designated as a pay-roll account in which funds were deposited from the business account as required to meet pay rolls. Appellant had no authority to sign checks except on the pay-roll account, and his name never appeared on the letterheads and billheads used in the construction business or on the office door.

In February, 1942, Fred O. Watson proposed to Schumacher the formation of a joint venture, which was entered into between them and three other contractors to bid upon a portion of the construction work for the Camp McCoy project at Sparta in this state. In March, 1942, Schumacher directed Stocke to make, with Watson, a quantity survey of labor and material required for the project on the basis of the plans and specifications; and the joint venturers submitted a bid which was accepted by the federal government. Appellant was not consulted with respect to the amount of the bid, and had no part in the formation of the joint-venture agreement, which pro-

vided for working capital of $400,000 in cash, contributed proportionately by the joint venturers. Schumacher's contribution was $100,000. No contribution of capital was made to Schumacher or the joint venture by appellant, and he took no part in the negotiation of the agreement and had nothing to say as to its terms and was not a party thereto. Schumacher, without consulting appellant, during the progress of the work on the Camp McCoy project, sold and rented some of his office and construction equipment to the joint venture and kept the proceeds without accounting to appellant. With Schumacher's consent appellant's services were loaned to the joint venture as its business manager at a salary of $4,484, paid to him at the rate of $600 per month, and as such manager he supervised its business records, had charge of the office personnel on the project, and was responsible for expediting material, checking bills and invoices. In addition appellant was Schumacher's personal representative on the job, but Watson was in general charge thereof for the joint venture and Stocke was his subordinate.

Schumacher, in reporting to the Minnesota division of employment and security, and similarly in his federal return, listed appellant as an employee to whom he paid wages in the first quarter in 1942, and he paid the tax on appellant's wages as such employee. But while appellant's services were loaned to the joint venture he was returned as its employee in the second and third quarters of 1942 upon its reports of taxable wages paid to its employees, and during the continuance of the job at Sparta he was listed as an employee of the joint venture on its pay rolls. Schumacher also sent to the state of Minnesota and the bureau of internal revenue information returns as to "wages paid" by him to appellant for the first and fourth quarters of 1942, and the year of 1943, and these returns included the amounts of appellant's income which are sought to be taxed in Wisconsin. On the income return filed by the joint venture in 1942 in Wisconsin, Schumacher appears as one

of the joint venturers, and the tax pursuant thereto was paid in 1942. For the same period, Schumacher, as one of the joint venturers, filed a Wisconsin return as an individual, in which he reported the distributive share received by him of the total joint-venture income accrued, less the proportion of his overhead allocable to Wisconsin and less the amount of his liability to appellant under their employment contract. All of Schumacher's income tax returns—Wisconsin, Minnesota, and federal—were made upon an individual basis, but on information blanks required of the taxpayer, consisting of Official Form 1099, United States Treasury Department, and Official Form 1-9, State of Minnesota, Schumacher reported as salary, wages, fees, commissions, and bonuses paid to O. A. Stocke for the year 1942, the sum of $1,230, which is the amount of salary paid by Schumacher to Stocke during the year 1942 according to his records. In appellant's income tax returns to the state of Minnesota for the years 1942 and 1943, under the item "salaries, wages, fees, commissions," etc., he reported the amount actually received by him on the monthly salary basis, reporting the amount that he received on the outside contracts as "other income."

Renegotiation proceedings by the federal government, to which the joint venturers decided to submit without consulting appellant, resulted in a large refund of profits to the government, which affected the amount appellant was entitled to receive from Schumacher under their employment contract. Subsequently, in 1942, there was determined in the same way the refund to the government of an additional amount of which Schumacher's share was $25,000, and as fifteen per cent of what he had received from the joint venture had already been paid by him to appellant, the latter, although he had not been consulted and had no part in the joint venturers' decision to submit to renegotiation, was required to refund to Schumacher $3,750, which was fifteen per cent of Schumacher's share of the

additional refund.  Appellant never owned any interest in the property, equipment, or other assets of the business of Schumacher or of the joint venture in which the latter participated, and appellant had no right to participate in the management, conduct, or control of the business of either the joint venture or of Schumacher, excepting as appellant was directed to act as their employee under their supervision and control.  The percentage which Schumacher was to pay as additional salary to appellant did not accrue to him when proceeds paid on a construction project were received in the business of the joint venture or of Schumacher, and the payments which were to be made to compensate appellant for his services did not accrue until projects were completed and fully paid for and the money for Schumacher's share of profits was received by him.

The board of tax appeals determined that in 1942, $32,103.90 was received from Schumacher by appellant in addition to the $4,484 received by him from the joint venture as salary which, as it was income derived by a nonresident from his personal services, was not taxable under secs. 71.02 (3) (c) and 71.01, Stats.  However, as to the sum of $32,103.90, the board concluded in a concurrent decision by two of its members that it was income *derived* by appellant *from business transacted within Wisconsin* and was therefore taxable in view of the following italicized terms in sec. 71.01, to wit:

"There shall be assessed, levied, collected and paid a tax on all net incomes as hereinafter provided, by every person residing within the state or by his personal representative in case of death; and by every *nonresident* of the state, *upon such income as is derived from* property located or business transacted within the state, except as hereinafter exempted. . . ."

Appellant contends his income of $32,103.90 was not derived by him from business transacted by him in Wisconsin, but was derived from the personal services performed by him for his employer, Schumacher, and that therefore it is income

which shall follow his place of residence, as the recipient thereof, as is prescribed in the following italicized provisions in sec. 71.02 (3) (c), Stats., to wit:

". . . Income derived from rentals and royalties from real estate or tangible personal property, or from the operation of any farm, mine or quarry, or from the sale of real property or tangible personal property shall follow the situs of the property from which derived. *All other income*, including royalties from patents, income derived from personal services, professions and vocations and from land contracts, mortgages, stocks, bonds and securities or from the sale of similar intangible personal property, *shall follow the residence of the recipient*, except as provided in section 71.095."

Appellant does not question the fact that Schumacher and others in the joint venture transacted business within the state of Wisconsin which produced a net income, so the question to be determined is whether appellant, as a nonresident, derived income from this business. Numerous cases are referred to where courts made a distinction between an employee and a member of a partnership. We find no reason for discussing them at length, as no claim is made by the respondent that the taxpayer was a member of a partnership, or that any partnership agreement existed. Reference is made by appellant to the case of *Dromey v. Tax Comm.* (1938) 227 Wis. 267, 274, 278 N. W. 400, where the court, in construing sec. 71.02 (3) (c), Stats., said:

"The statutes make a clear and easily understood distinction between income from business and that derived from personal services."

The court further said it was the legislative intent to subject salaries and wages of Wisconsin residents to an income tax irrespective of its source. Thus it would follow that it was the legislative intent to tax the income of a nonresident derived from business transacted in the state of Wisconsin. It is conceded that Wisconsin could pass a law taxing the income of

nonresidents for personal services rendered within the state of Wisconsin, but this has not been done. Under sec. 71.02 (3) (c), Stats., income derived from personal services follows the residence of the recipient. The mere fact that the income in question may be taxable in the state of Minnesota does not prevent the state of Wisconsin from taxing it. *Hughes v. Tax Comm.* (1938) 227 Wis. 274, 278 N. W. 403; *Newport Co. v. Tax Comm.* (1935) 219 Wis. 293, 261 N. W. 884. The state of Minnesota may tax residents of Wisconsin upon income derived from business or property located in Minnesota or services performed there. *Shaffer v. Carter,* 252 U. S. 37, 40 Sup. Ct. 221, 64 L. Ed. 445; *Travis v. Yale & Towne Mfg. Co.* 252 U. S. 60, 40 Sup. Ct. 228, 64 L. Ed. 460.

The legislature has not attempted to define income from personal services and income derived from business transacted within the state. In *State ex rel. Lerner v. Tax Comm.* (1933) 213 Wis. 267, 271, 251 N. W. 456, it was said:

" 'Income derived from personal services' has not heretofore been defined by this court. Comprehensively and exactly to define it would be difficult if not impossible."

In 19 C. J. p. 384, the term "doing business" is explained in this manner:

"Any transaction with persons or any transaction concerning any property situated in the state through any agency whatever acting for it within the state."

We shall now examine the effect of the agreement existing between appellant and Schumacher. Prior to the Camp McCoy contract Stocke had been employed as an estimator and general office manager for Schumacher at Minneapolis, Minnesota, under an agreement, confirmed January 2, 1942. Schumacher agreed to pay Stocke the sum of $350 per month for services while he was engaged in the office at Minneapolis in connection with general contracting business on work in Minneapolis or its immediate vicinity. But a separate and

different contract was entered into with reference to business outside the vicinity of Minneapolis. Stocke was given an interest in the outside business on condition that Schumacher would manage the business and furnish the capital, the net profit to be divided eighty-five per cent to Schumacher and fifteen per cent to Stocke, and losses to be absorbed on the same basis. Stocke was referred to as an "employee" in the letter confirming the verbal understanding, but we have a right to examine all the facts and circumstances to determine whether this is in fact true.

Stocke was paid his full monthly salary by Schumacher during the first three months of 1942, and it was during that time that he made the estimates on the Sparta job. During the next six months he was employed as business manager of the joint venture at Sparta, and paid a monthly salary for such services from joint-venture funds. He testified that he was also Schumacher's personal representative on the job, but with his salary of $600 a month paid by the joint venture, he was undoubtedly required to give his entire services to it. During part of that time Schumacher had another contract in the state of Pennsylvania, which Stocke never visited, and if Stocke had gone to Pennsylvania in place of being employed by the joint venture in Wisconsin he would still have been entitled to his share of the net profit from the McCoy contract, just as he received his share of the Pennsylvania contract which he never saw.

If Schumacher and Stocke had been residents of Wisconsin, and prior to and at the time the McCoy contract was carried out this same agreement had been in effect and Stocke had been paid his regular salary for the first three months of 1942, and the joint venture had lost the same amount that it made on the contract, and Stocke had received other income from other sources, he certainly would have claimed a business loss for the amount he lost as against his income, which would have been a proper claim. We are justified in saying this because he re-

ported this income as "other income" on his income tax return to the state of Minnesota, and likewise it was not reported as income from salaries, wages, fees, commissions, and bonuses in Schumacher's report to the federal income tax department or the Minnesota income tax department on forms requested to be furnished to them by him for the year 1942.

While Stocke did not furnish any of the original capital he was bound to replace fifteen per cent of the capital used to absorb losses if any were suffered. Under the circumstances the liability to replace capital loss is equivalent to furnishing it. Stocke would have been entitled to the same portion of the net income from this joint venture even though he had never been employed on the project and had stayed in Minneapolis, rendering services for which he had been paid his monthly salary of $350 per month. This does not conflict with *Wiik v. Department of Taxation, ante,* p. 325, 24 N. W. (2d) 685, where it was held that an agreement to pay five per cent of the net income with a minimum guarantee of $3,000 per month for services on a specific contract was a contract of employment for personal services only. Thus we conclude that the income received by Stocke was not for personal services but was derived from business transacted in Wisconsin.

*By the Court.*—Judgment affirmed.

FRITZ, J. (*dissenting*). By the use in the contract of January 2, 1942, between the appellant, Oswald A. Stocke, and his employer, Maurice Schumacher, of the expressions "the terms of your employment," "while you are engaged . . . in my office, in connection with my general contracting business, . . . you are to receive monthly a salary of $350," and "It is understood that this arrangement is conditional upon the continuation of your services to me as an employee,"—the parties definitely characterized the intended purpose and nature thereof to be a contract of employment. And the arrangement by which appellant was to receive as salary fifteen per cent of Schumacher's net profits on some of his projects was expressly

stated to be conditioned upon the continuation of appellant's services as an employee of Schumacher. Thus it was only by appellant continuing in that status,—and not in some other relationship,—that he was entitled to receive for his services for Schumacher fifteen per cent of his net profits; and by their acts and conduct under and in performance of that contract, there is established the continuing existence of the employment relationship. Appellant never made any contribution of capital or owned any interest in the property, equipment, or other assets of the business of either Schumacher or the joint venture in which the latter participated with F. O. Watson and others; and appellant took no part in any of the negotiations in relation to the contract between the joint venture and the federal government. During the progress of the work under that contract appellant was Schumacher's personal representative on the job, and appellant's services were loaned, with Schumacher's consent, to the joint venture as its business manager at a monthly salary; but Watson was in general charge of the job for the joint venture and appellant served as his subordinate, with no right to participate in the management, conduct, or control of the business of either the joint venture or of Schumacher, excepting as appellant was directed to act as their employee under their supervision and control. The percentage, which Schumacher had contracted to pay as additional salary to appellant, did not accrue to him when net proceeds on the Camp McCoy project were received in the business of the joint venture or of Schumacher; and the payments which the latter was to make to compensate appellant for his services did not accrue and were not made to him until the project was completed and fully paid for and the amount of Schumacher's share of profits was received by him.

In view of those facts, the conclusion that there existed any other relationship between them than that of employer and employee is contrary to the intention evidenced by their written contract and their performance thereunder consistently there-

with.   As is stated in *Canton Bridge Co. v. Eaton Rapids,* 107 Mich. 613, 614, 616, 65 N. W. 761,—

"To determine whether persons are in fact partners, we must look to their intention, and this is deducible from their declaration as to their intention, and the agreements that they make regarding the subject matter; and, where the contract under which the business engagement is made contains the express or implied disavowal of an intention to assume the partnership relation, no partnership will be found to exist, unless such declaration is so at variance and so inconsistent with their engagement as to be irreconcilable."

Likewise this court said in *Sander v. Newman,* 174 Wis. 321, 328, 181 N. W. 822,—

"Partnership contracts, like other contracts, are governed by the intent of the parties, and the generally accepted test of whether or not a partnership exists is that a partnership is formed when the parties involved in the transaction have the intention that they should be partners.   20 Ruling Case Law, p. 831, sec. 36.   For as there pointed out: 'Every partnership rests on the mutual consent of its members.'"

When, as in the case at bar, the proof establishes that the parties intended their relationship to be that of employer and employee, rather than a partnership or joint venture, and there is no such community of interest as makes each of the parties a coprincipal with joint authority or right to participate in the management, control, and disposal of the business, the sole fact that the employee, whose services were to be compensated by payment of a percentage of his employer's net profits, agrees also to assume fifteen per cent of the employer's losses, if any, on a project, does not make them partners or joint venturers. As the court said in *Canton Bridge Co. v. Eaton Rapids, supra* (in holding that an agreement, under which an "agent" was to be paid one half of the net profits and the losses, if any, were to be divided in the same way, was a contract of employment),—

"There is nothing to indicate that Wheaton was to own any share in these materials.   He was to give his services, and that

was all of the obligation that he assumed. The contract does not bind him to put a dollar into the common enterprise. These things being true, it is entirely consistent that he should be an agent, as the contract states, and that he should be 'paid' by the company for 'his services,' and that his salary or compensation should be one half of the profits. . . . Does the sole remaining fact, viz., the sharing of losses, necessarily make the parties partners, against the express agreement that Wheaton was the agent, to be 'paid' by plaintiff for his 'services,' for whatever labor it should direct him to perform in relation to its property? It would seem to be reasonable to conclude that the provision concerning losses was designed to induce care on the part of the agent in taking contracts. It carried his interest in case of unprofitable work a little beyond the line of the mere loss of profits, and no reason suggests itself why that might not be consistent with the existence of an agency, instead of a partnership."

To the same effect see *Hutchinson v. Birdsong*, 211 N. Y. App. Div. 316, 207 N. Y. Supp. 273; *Dwinel v. Stone*, 30 Me. 384; *Morgan v. Stearns*, 41 Vt. 398; *Black v. Brundige*, 125 Cal. App. 641, 13 Pac. (2d) 999; *Smith v. Grove*, 47 Cal. App. (2d) 456, 118 Pac. (2d) 324; *Fee-Crayton Hardwood Lumber Co. v. Fee-Crayton Hardwood Co.* 171 Ark. 831, 286 S. W. 967.

Consequently, in view of the provisions in secs. 71.01 and 71.02 (3) (c), Stats., and the effect and application thereof as stated in *Wiik v. Department of Taxation, ante,* p. 325, 24 N. W. (2d) 685, in relation to income derived from services performed in this state by a nonresident under facts substantially similar in many material respects, as in the case at bar, excepting that the employee had not agreed to assume a percentage of his employer's net loss, appellant's income is not taxable under the statutes. As the income was compensation for services performed for Schumacher by appellant "without the material aid of capital owned by him," it was not income derived by him from "business transacted" but constitutes income derived from "personal services" within the meaning of

those terms as used in secs. 71.01 and 71.02 (3) (c), Stats. *State ex rel. Lerner v. Tax Comm.* 213 Wis. 267, 251 N. W. 456. And as it was income received by appellant as compensation as an employee of Schumacher there is applicable thereto the provision in sec. 123.04 (4), Stats., that,—

"The receipt by a person of a share of the profits of a business is *prima facie* evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment . . . as wages of an employee. . . ."

I am authorized to state that Mr. Justice FAIRCHILD and Mr. Justice WICKHEM join in this dissent.