SHELLEY, Respondent, v. DEPARTMENT OF REVENUE, Appellant.*

*No. 80 (1974). Submitted under sec. (Rule) 251.54 September 9, 1975.—Decided November 25, 1975.*
(Also reported in 235 N. W. 2d 515.)

* Motion for rehearing denied, with costs, on January 28, 1976.

For the appellant the cause was submitted on the brief of *Robert W. Warren*, attorney general, and *Allan P. Hubbard*, assistant attorney general.

For the respondent the cause was submitted on the brief of *Fred D. Hartley, Neil F. Guttormsen, Thomas B. Hartley* and *Heide, Sheldon, Hartley, Thom & Wilk*, all of Kenosha.

DAY, J. This case raises two questions. First, are brokerage commissions earned out of state, but by a resident, income from "personal services" subject to Wisconsin income tax, or is such income from a "business" and not subject to Wisconsin income tax under sec. 71.07 (1), Stats.?[1] We conclude that such income is from personal services and subject to Wisconsin income tax. The second question is whether capital gains income from commodity transactions engaged in out of state by the resident taxpayer on his own account is subject to taxation by Wisconsin as income. We conclude that it is.

---

[1] "71.07 **Situs of income; allocation and apportionment.** (1) For the purposes of taxation income or loss from business, not requiring apportionment under sub. (2), (3) or (5), shall follow the situs of the business from which derived. Income or loss derived from rentals and royalties from real estate or tangible personal property, or from the operation of any farm, mine or quarry, or from the sale of real property or tangible personal property shall follow the situs of the property from which derived. Corporation income from personal services performed by employes of corporations, and from patents, copyrights, trademarks, tradenames, plans, specifications, blueprints, processes, techniques, formulae, designs, layouts, patterns, drawings, manuals and technical know-how shall be deemed business income and shall follow the situs of the business. Gain or loss by a corporation on redemption of its own bonds shall be deemed business income or loss and shall follow the situs of the business, and a corporation's bond premium or discount shall be deemed business loss or income and shall follow the situs of the business. Income from personal services and from professions of resident individuals shall follow residence. Income from personal services of nonresident individuals, including income from professions, shall follow the situs of the services. All other income or loss, including income or loss derived from land contracts, mortgages, stocks, bonds and securities or from the sale of similar intangible personal property, shall follow the residence of the recipient, except as provided in sub. (7). For the purposes of taxation, interest received on state and federal tax refunds when the tax refunded was on business income or property shall be deemed income from business and shall follow the situs of the business from which derived."

The respondent in this case, Daniel J. Shelley, resides in Delavan but is a grain broker and trader in commodities operating out of the Chicago Board of Trade facility in Chicago, Illinois. While he does maintain an office in his home, he can only buy and sell commodity futures on the floor of the exchange in Chicago, and he commutes daily. He buys and sells commodity futures for others and receives commissions for his services. He also buys and sells futures for himself. He testified that in 1971 he traded in approximately 350-million bushels of wheat. For the years 1966 through 1969, he estimated that he traded two thirds of that amount each year. He traded more for customers than for himself, but he testified that lately he has been trading more for himself. For the years in question here, his brokerage income, and income (or loss) from trading on his own account, were as follows:

|  | Broker's Commissions | Gains and Losses on Own Account |
| --- | --- | --- |
| 1966 | $38,184.04 | $15,755.15 |
| 1967 | 17,590.85 | (1,000.00) |
| 1968 | 19,907.54 | 569.00 |
| 1969 | 16,347.00 | 18,813.00 |
| Totals | $92,029.43 | $34,137.15 |

The Chicago Board of Trade ("board") is a grain exchange, and provides a facility where various commodities can be marketed for current and future delivery. To become a member of the board, one must, among other things, furnish proof of financial responsibility and good character. In 1953 when Mr. Shelley became a member, a membership fee was $3,300, but by 1972 it would have cost $40,000 for such membership. The members of the board, through a subsidiary corporation, own the 40-

story building and land upon which it stands at 141 West Jackson Boulevard, Chicago, Illinois. The facilities of the building include a large trading area, which is referred to as the "pit," or "exchange floor." The board is governed by a board of directors, and operates by its own rules and regulations. Members' annual dues in 1972 were $600, and occasionally additional assessments have been made; in 1971 a $330 assessment was levied. Members incur additional expenses for telephone and clerical services.

The Board of Trade as such does not buy or sell commodities, but simply provides a facility for such buying and selling, establishes and enforces trading rules, and gathers and disseminates information affecting prices and reports prices for commodities that have been traded. All the purchases and sales that Mr. Shelley makes on his own behalf or on behalf of his clients are cleared through the Chicago Board of Trade clearing corporation, which acts as a bookkeeper for the transactions. The board provides Mr. Shelley with facilities, mail delivery, telephone services and pricing information. He does not have office facilities as such in the building, but he uses the floor of the exchange.

Mr. Shelley testified that he ordinarily arrives on the floor of the exchange every business day at 8:45 a.m., where he reads information from the various news services before the market opens at 9:30 a.m. The market closes each working day at 1:15 p.m., but he occasionally does not leave the floor until approximately 2 p.m., as he must figure out his purchases and sales for the day.

Most grain is marketed through a system of forward pricing or grain futures contracts. Futures contracts are bought and sold in an open auction market, in a specified portion of the pit area according to the particular grain. "Floor brokers" act as agents for others and "floor traders" or "scalpers" act for their own accounts; Mr.

Shelley does both. The minimum "round lot" is 5,000 bushels, and all trade is conducted in multiples of 5,000 bushels. The contract is made by open outcry in the pit by the broker who is buying or selling. For instance, he may offer to buy a certain quantity of wheat at a particular price; another broker in another part of the wheat pit will indicate a sale, and thus a transaction would transpire. At the moment of transaction, the transaction is one between brokers. The floor broker is the principal; in other words, he is responsible for the particular contract and he is not relieved of his obligation as principal until the party for whom he is trading actually accepts the transaction. If the broker makes an error in executing his customer's order, he retains his liability as principal and is responsible for the transaction. This role as principal may last for a matter of a few minutes, or it may run up to several days. As Mr. Shelley's volume of business has increased, his error account has likewise increased. His errors for the years in question increased from $774.55 in 1966 to $6,582 in 1969. He has a customer error account to cover these losses.

Mr. Shelley testified that speed, accuracy and good market sense are the qualities one should look for in a broker. Customers come to him because they feel he has expertise. He does not go outside the exchange to solicit his customers, who are various brokerage and commercial firms. Mr. Shelley does not deal with individuals.

The Department of Revenue made a determination that the income derived from these various transactions for customers and for himself is taxable as income in the state of Wisconsin. An appeal was taken by the taxpayer to the Wisconsin tax appeals commission. The commission upheld the department's denial of the taxpayer's application for abatement of additional assessment of in-

come for the years 1966 to 1969 inclusive of $8,164.11. Mr. Shelley appealed to the circuit court for a review of the decision and order of the commission pursuant to ch. 227, Stats. The circuit court held that the taxpayer was engaged in "business" outside the state, and therefore not subject to the tax. Judgment reversing the Wisconsin tax appeals commission was entered March 15, 1974. From that judgment the Department of Revenue now appeals.

The facts in this case are not in dispute. The only question is whether or not the activities of the taxpayer in acting as a broker for others constitutes a "business" or "personal services" within the meaning of sec. 71.07 (1), Stats. This is an issue of law rather than an issue of fact, and we are not bound by the determination of the tax appeals commission. Cases previously decided under this statute have held this to be a question of law rather than of fact. *Whitney v. Department of Taxation* (1962), 16 Wis. 2d 274, 114 N. W. 2d 445; *State ex rel. Lerner v. Tax Comm.* (1933), 213 Wis. 267, 251 N. W. 456.

Sec. 71.01 (1), Stats., reads in part:

"**71.01 Imposition of tax; exempt income. (1)** PERSONAL INCOME TAX. For the purpose of raising revenue for the state and the counties, cities, villages and towns, there shall be assessed, levied, collected and paid a tax on all net incomes as hereinafter provided, by every natural person residing within the state . . . ."

The words "as hereinafter provided" make it clear that sec. 71.07, with which we are concerned, is a taxing statute rather than an exemption statute as contended by the state, and should, therefore, be narrowly construed. *Ramrod, Inc. v. Department of Revenue* (1974), 64 Wis. 2d 499, 504, 219 N. W. 2d 604. Before the tax can be levied on income earned out of state, it must be

shown that the income derives from personal services rather than from a business.

Personal services may indeed be the "business" of a particular taxpayer, and a professional person may likewise be in the "business" of furnishing certain services for remuneration. However, the legislature has made a distinction between "business" income, and income derived from "personal services and from professions . . . ," the former being nontaxable if earned out of state, and personal service and professional income of a resident being subject to taxation even though earned out of state. It is therefore necessary to determine whether under a particular and given set of facts the income is from a business, or from personal services or a profession.

The taxpayer contends that he is actually in the "grain business." The implication is that the business is not unlike that of ladling out bushels of grain in a feedstore. However, we are persuaded by the reasoning that what the taxpayer as a broker herein deals with in buying and selling commodity "futures" are the rights to commodities rather than the commodities themselves. *Faroll v. Jarecki* (7th Cir. 1956), 231 Fed. 2d 281, 288. These rights are intangible property which may appreciate or depreciate in value, *Commissioner of Internal Revenue v. Covington* (5th Cir. 1941), 120 Fed. 2d 768, 771 (concurring opinion). Taxpayer's function in the grain pit was distinct from that of a merchant taking orders to buy or sell a specific number of bushels of grain. It was his expertise in knowing how, when, and where to make the transaction that attracted clients to him. As he himself testified, he attracted customers because of his expertise as a broker in the pit. He stated that the selection of a broker is a very important decision for a customer to make, that skill is an important factor in selecting a broker, that some brokers are too old to act

as brokers, and that the qualities that he would look for in selecting a broker are speed, accuracy, and market sense, the latter being the most important quality. Personal service is the essence of the taxpayer's activity at the grain exchange.

Prior to 1955, sec. 71.07 (1), Stats., read in part as follows:

"71.07 **Situs of income; allocation and apportionment.** (1) For the purposes of taxation income from mercantile or manufacturing business, not requiring apportionment under section 71.07 (2) shall follow the situs of the business from which derived."

In 1955 the words "mercantile or manufacturing" were deleted from the statute. This was intended to broaden the concept of "business" and to overcome the decision in the case of *Plain v. Harder* (1955), 268 Wis. 507, 68 N. W. 2d 47, where this court had held that the words "mercantile or manufacturing" excluded construction companies. This court has not had occasion since the change in the statute to construe the word "business" as contrasted to "personal services." We find only one case where that interpretation was made prior to the change in the statute, *State ex rel. Lerner v. Tax Comm.* (1933), 213 Wis. 267, 271, 251 N. W. 456. In that case the court held that the solicitation of publishing contracts in other states was not "mercantile or manufacturing business," and therefore fell within the residual class of "all other income . . . including . . . the income derived from personal services." *Lerner* at 271. The court therein stated:

" 'Income derived from personal services' has not heretofore been defined by this court. Comprehensively and exactly to define it would be difficult if not impossible. We think it fairly clear that the legislature meant by 'all income derived from personal services' such income or gains as result from the performance of services or labor

*without the material aid of capital."* (Emphasis supplied.)

The Department of Revenue has adopted the italicized language—the "capital" test—as the measure of distinction between personal services and businesses, and this court has also recognized the "capital" test in other contexts. *Stocke v. Department of Taxation* (1946), 249 Wis. 408, 25 N. W. 2d 65; *Wiik v. Department of Taxation* (1946), 249 Wis. 325, 24 N. W. 2d 685. It is the taxpayer's argument here that his income is derived with the material aid of capital; the department, of course, argues the contrary.

One other case is relevant to the issue of the effect of the use of "capital" as a test for determining whether a particular activity is a business as contrasted to being a profession or a "personal service." In *Whitney v. Department of Taxation* (1962), 16 Wis. 2d 274, 114 N. W. 2d 445, the court held that income derived from a New York engineering firm by a Wisconsin partner was income from a "profession," and therefore subject to tax under sec. 71.07 (1), Stats. The fact that petitioner's firm had monthly payroll of $136,000, that petitioner had a $277,000 capital investment, and that the firm had offices in New York, Athens, and Paris did not make the enterprise a "business." The court held that the labor force, capital, and physical plant were "only the normal concomitants of conducting a large professional firm." The court in *Whitney* specifically noted that it was concerned with professional, rather than personal service, income. It is not argued, and we do not hold, that the present taxpayer should be considered a professional. Nevertheless, we find the *Whitney* distinction between true capital investment, and capital investment made as an incident of offering professional services, to be analogous to the present case involving personal services.

Taxpayer's capital investment in this case is principally in the form of the $40,000 worth of a membership in the exchange at the time this litigation arose. This, however, is more in the nature of a fee or, in effect, a license to have the right to be in a particular place to carry on the activities that we hold to be personal services to his clients, as that term is used in the statute. His annual dues of $600 and his "customer error count" represent incidental charges in the case of the former, and a mere guarantee to cover errors in the latter, and are hardly a kind of capital investment, as understood in the ordinary business sense.

Where the source of the income is the sale or rental of goods or of the labor of others, a taxpayer may be deemed to be in "business," but where the taxpayer is primarily selling his services, as the taxpayer is here doing as a broker, or as Whitney was doing as an engineer, the taxpayer, we hold, renders "personal services." The test of capital investment under such circumstances must be viewed in the perspective of the entire activity engaged in by the taxpayer.

We conclude, therefore, that the income derived by the taxpayer as a broker during the taxable years in question is income derived from "personal services," and is taxable under Wisconsin law.

As to the income derived by taxpayer from his activities as a "scalper" or dealer in commodities for his own personal account, we conclude as set forth above, that this is income derived from the sale of intangible personal property, and under sec. 71.07 (1) of the statutes is taxable in Wisconsin since he is a Wisconsin resident. It is difficult for the taxpayer to argue that he holds commodity futures as business assets, since his tax returns show that his trading income was reported as gains or losses on capital assets, and that he claimed preferential capital gains treatment on the one occasion

in 1966 when he held the traded securities long enough to qualify for such treatment.

Taxpayer argues that he must be in "business" because he is permitted to take "business" expense deductions from taxable income. However, the type of expenses deducted by the taxpayer are those commonly allowed to professionals as expenses incurred in deriving income. In this case, the record does not suggest that any deducted expenses related to his personal trading income. Even if there had been some such deductions allowed, it would not take such transactions out of the statutory classification of dealing in intangibles.

*By the Court.*—Judgment reversed.